UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SAMMY J. AGUIRRE,<br><br>Defendant. | Case No. 4:13-cr-00112-BLW<br><br>MEMORANDUM DECISION AND ORDER |

### INTRODUCTION

Before the Court is Defendant Sammy J. Aguirre's Motion to Suppress (Dkt. 17). Aguirre moves the Court to suppress "all evidence obtained" in this case.

First, Aguirre seeks to suppress evidence obtained from his vehicle during a March 21, 2013 stop. He argues that the stop on March 21, 2013, was pretextual, there was no probable cause to search the vehicle, or trunk, or locked containers in the vehicle, and the officers did not obtain consent to conduct the search.

Aguirre also seeks to suppress evidence obtained during a search of his residence. Aguirre maintains that the officers had no warrant to search a tool box at his home, and that he did not consent to the search.

On July 19, 2013, the Court conducted an evidentiary hearing, and ruled from the bench. For the reasons set forth below and during the hearing, the Court will grant in part and deny in part Defendant Aguirre's motion to suppress.

## BACKGROUND

Prior to March 21, 2013 – the date Aguirre was stopped – officers from the Idaho State Police and the Idaho Falls Police Department began surveillance of Aguirre after intercepting jail calls between Aguirre and co-defendant, Emilio Martinez, who had been arrested for trafficking methamphetamine. According to the government, the conversations suggested Aguirre was involved with Martinez in drug trafficking. Officers also gleaned from the intercepted calls that Aguirre would be traveling on March 21, 2013, to a location outside the Idaho Falls area to pick up methamphetamine.

On March 21, 2013, at approximately 9:00 a.m., officers observed Aguirre leave his home in Idaho Falls and travel to Pocatello. The officers began tailing Aguirre to Pocatello. As the officers were following Aguirre to Pocatello, they received information that a probationer had just told his probation officer that Aguirre supplied the methamphetamine to the person who had sold it to the probationer.

In Pocatello, officers observed Aguirre exit his vehicle and enter a blue 2001

Subaru, driven by an individual known to the officers as Jason Campbell. The two men then proceeded westbound on Interstate 86, and a surveillance team followed. Detective Blackhawk testified that the two men engaged in significant "counter-surveillance," apparently pulling on and off the interstate and diving down country roads for short periods before turning around.

Eventually, Aguirre and Campbell arrived at a trailer court in Rupert, Idaho. When they arrived, Aguirre exited the car at the entrance to the trailer court and apparently walked into a trailer, but the surveillance team could not see which trailer he entered. Meanwhile, Campbell left in the car and parked at a gas station several miles away. Thirty minutes later, the surveillance team observed Campbell drive back to the trailer court, where Aguirre got back into the car, and the two men got back on the interstate, heading in the direction of Pocatello after a brief stop at a convenience store on the edge of town. On the way back, Aguirre and Campbell did not engage in counter-surveillance, suggesting to Detective Blackhawk that Aguirre and Campbell had drugs in the car and did not want to risk being pulled over.

Detective Sergeant John Kempf, a member of the surveillance team, testified that, based on his training and experience, there was probable cause to believe that Aguirre and Campbell were engaged in drug trafficking and that evidence of that activity would be found in their vehicle when they started back to Pocatello. Arrangements were therefore made for a patrol officer and canine officer to stop the vehicle. But the surveillance team wanted an independent reason to stop the vehicle, so they continued to

MEMORANDUM DECISION AND ORDER - 3

follow Aguirre and Campbell until they observed the vehicle cross the fog line more than once.

Detective Sergeant Kempf relayed his observations of the vehicle crossing the fog line to Corporal Brady Barnes of the Idaho State Police.  Corporal Barnes therefore stopped the vehicle based on Detective Sergeant Kempf's observation that the vehicle had crossed the fog line.

After receiving the information that the vehicle had crossed the fog line, Corporal Barnes activated his overhead lights and conducted a regular traffic stop. Corporal Barnes testified that Campbell seemed excessively nervous – talking fast with jerky movements. Corporal Barnes informed Campbell of the reason for the stop and asked him routine questions, such as where he was coming from and where was he going.  Campbell answered that they were coming from American Falls, which Corporal Barnes knew to be untrue.  Corporal Barnes obtained both Campbell and Aguirre's information and returned to his vehicle to write a ticket.

Meanwhile, Deputy Clint Brown, a canine officer, arrived with Paco, his narcotics dog.  Deputy Brown asked Corporal Barnes to have both Campbell and Aguirre exit the car while Paco performed a canine sniff.  When asked to exit the vehicle, Campbell became loud, abusive, and obscene, but Aguirre remained calm.

While the two men stood outside the vehicle, Deputy Brown returned to the vehicle with the dog to perform the sniff.  The dog first indicated a drug odor in the center console.  Deputy Brown did not initially find drugs in the center console, so he

continued the search to confirm or dispel any suspicion that drugs may be present.  Later drugs were found near the center console.  However, before those drugs were discovered, Paco indicated the odor of drugs in the toolbox in the trunk, which Corporal Barnes had accessed through the backseat.  Deputy Brown found narcotics in the toolbox.  The search revealed in excess of one pound of methamphetamine. Aguirre and Campbell were then arrested.

After Aguirre was arrested, several officers went to Aguirre's residence in Idaho Falls.  Detective Dan Godfrey spoke with the other two occupants of the residence, Leroy Aguirre, Aguirre's brother, and Roslinda Aguirre, Aguirre's wife.  Both Leroy and Roslinda told Detective Godfrey they lived at the residence.  Detective Godfrey then told Leroy and Roslinda that Aguirre had been arrested near American Falls with a large quantity of methamphetamine, and he asked the home occupants whether they would consent to a search of the home.

Detective Godfrey testified both Leroy and Roslinda consented and signed a basic consent to search the home before the officers began the search.  Prior to the consent, the officers never drew their weapons and never sought to arrest or detain Leroy or Roslinda.  Detective Godfrey testified that Leroy accompanied him throughout much of the search of the home.  Roslinda, however, testified that she did not consent to the search, and she only signed the consent form after the officers had finished the search.

A search of the common areas of the residence revealed a .40 caliber handgun, several other items relating to the sale of narcotics including plastic baggies and parts of a

drug ledger. The contraband was found in the attached garage. Officers also found a shotgun with a barrel sawed off to 12 inches, and several other guns, three of which Leroy claimed were his, and thus, not seized. The shotgun was found in the locked trunk of Aguirre's car.

## ANALYSIS

**1.     The Stop and Search of the Vehicle Did Not Violate the Fourth Amendment.**

The Fourth Amendment provides the right to be free from unreasonable searches and seizures. Officers may stop an individual or vehicle if they have reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20-21(1968). "Such reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (internal citations removed).

The March 21 traffic stop was valid. The vehicle the defendant was traveling in was stopped after officers observed violations of traffic laws, as well as behavior indicative of drug trafficking. Officers had surmised, based on intercepted jailhouse telephone conservations, that Aguirre was involved in drug trafficking and that he would be traveling outside of Idaho Falls on March 21, 2013, to pick up methamphetamine. On March 21, 2013, the surveillance team observed Aguirre enter a vehicle that engaged in driving patterns consistent with counter-surveillance. On the way back, the vehicle did not engage in counter-surveillance but instead attempt to drive perfectly, which suggested

that Campbell and Aguirre had drugs in the car. Collectively, this gave the officers probable cause, or at the very least reasonable suspicion, to believe that Aguirre had engaged in a drug transaction, and there would be drugs in the vehicle. Corporal Barnes also had reason to stop the car based on information that the vehicle had crossed the fog lines.

The search of the vehicle was also valid. Upon stopping the vehicle, a canine was immediately at the scene. As an officer contacted the driver and passenger, the canine walked around the vehicle and indicated for the presence of narcotics in the vehicle. "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). And when a canine sniff indicates a vehicle contains narcotics then probable cause is established to search the vehicle. *See United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993). Therefore, Aguirre's Fourth Amendment rights were not violated by the dog sniff and subsequent search of the vehicle.

## 2. The Search of the Home Was Reasonable Based on Valid Written Consent from Two Occupants of the Home.

Generally, a warrantless search of a person's residence is unreasonable per se. *Payton v. New York*, 445 U.S. 573, 586 (1980). One exception to the general rule recognizes the reasonableness of a search of a home when voluntary consent "to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*,

415 U.S. 164, 171 (1974); *United States v. Murphy*, 516 F.3d 1117, 1122 (9th Cir. 2008). This includes consent given by a fellow occupant when the suspect is absent. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Murphy*, 516 F.3d at 1122.

> Whether the consent was voluntary is based on several factors:
>
> (1) whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that she had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained.

*United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009). "All five factors need not be satisfied in order to sustain a consensual search." *United States v. Vongxay*, 594 F.3d 1111, 1120 (9th Cir. 2010).

Here, the weight of these five factors favors a finding of voluntary consent. Neither Leroy nor Roslinda were in custody, and the officers' guns were not drawn. And because neither Leroy nor Roslinda were in custody, Miranda warnings were not required. Nor is there any evidence that the officers told either Roslinda or Leroy that they could obtain a warrant. Each of these factors suggest Leroy and Roslinda's consent was voluntary.

Roslinda Aguirre did testify that she did not consent to the search, and she did not sign the consent form until after the search had already been performed. The Court, however, finds Detective Godfrey's testimony to the contrary to be more credible.

The remaining voluntariness factor does not tip the scales in Aguirre's favor. Although the officers never told Roslinda and Leroy that they had a right to refuse

MEMORANDUM DECISION AND ORDER - 8

consent to search, "this factor is not an absolute requirement for a finding of voluntariness." *Brown*, 563 F.3d at 416. Given the weight of the other factors, the Court finds the warrantless search of the house was therefore lawful.

Aguirre, during the evidentiary hearing, argued that the evidence should nevertheless be suppressed because the contraband was found in the garage and the officers did not obtain a separate consent to search the garage. But there are two problems with this argument. First, the garage was attached to home, thereby forming a single structure. The consent therefore extended to the attached garage. *C.f., United States v. Frazin,* 780 F.2d 1461, 1467 (9th Cir. 1986) (finding no reason to distinguish between an attached garage and the rest of the residence for Fourth Amendment purposes). Second, neither Leroy nor Roslinda objected to the search of the garage. In fact, Detective Godfrey testified both Leroy and Roslinda were present, for at least part of the time, while the officers searched the garage. Their behavior suggests that their consent extended to the garage. *See, e.g., U.S. v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) ("Failure to object to the continuation of a vehicle search after giving general consent to search is properly considered as an indication that the search was within the scope of the initial consent." (citation omitted)). For these reasons, the Court finds the search of the garage was valid.

The Court, however, finds that any evidence found in the locked truck of Aguirre's car should be suppressed. The government presented no evidence either Roslinda or Leroy had common authority over the car. Thus, they could not consent to a

search of the car, and the officers did not have a warrant to search the locked trunk. The search of the trunk therefore violated the Fourth Amendment.

The government concedes that it did not have either a warrant or consent to search a locked toolbox, to which the consenting occupants did not have access. The government therefore does not intend to use any evidence obtained from the lockbox.

## ORDER

**IT IS ORDERED that** Defendant Sammy J. Aguirre's Motion to Suppress (Dkt. 17) is **GRANTED in part and DENIED in part** as more fully explained in the foregoing decision.

DATED: August 7, 2013

_____
B. Lynn Winmill
Chief Judge
United States District Court